**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-02764-CMA

WEST SLOPE COLORADO OIL AND GAS ASSOCIATION,

      Plaintiff,

v.

SALLY JEWELL, in her official capacity as the Secretary of the U.S. Department of the Interior;
UNITED STATES DEPARTMENT OF THE INTERIOR;
DANIEL M. ASHE, in his official capacity as the Director of the U.S. Fish and Wildlife Service;
UNITED STATES FISH AND WILDLIFE SERVICE;
RUTH WELCH, in her official capacity as the State Director of the Bureau of Land Management Colorado State Office;
BUREAU OF LAND MANAGEMENT COLORADO STATE OFFICE;
KENT WALTER, in his official capacity as Field Manager of the Bureau of Land Management White River Field Office

      Defendants.

---

**ORDER AFFIRMING AGENCY DECISIONS**

---

      Plaintiff West Slope Colorado Oil and Gas Association ("Plaintiff") appeals the

administrative actions taken by Defendants Sally Jewell, in her official capacity as the

Secretary of the United States Department of the Interior; United States Department of

the Interior ("DOI"); Daniel M. Ashe, in his official capacity as the Director of the United

States Fish and Wildlife Service; United States Fish and Wildlife Service ("FWS"); Ruth

Welch, in her official capacity as the State Director of the Bureau of Land Management

Colorado State Office; Bureau of Land Management Colorado State Office "(BLM"); and

Kent Walter, in his official capacity as Field Manager of the Bureau of Land Management White River Field Office (collectively "Defendants"). Plaintiff seeks the reversal of the FWS July 26, 2012 permit to Colorado State University ("CSU") for a research project, the FWS October 4, 2012 Biological Opinion (BiOp")[1] and the Interior Board of Land Appeals ("IBLA") August 21, 2014 Order IBLA 2014-11 ("Order") that affirmed the BLM's September 23, 2013 Final Environmental Assessment/Decision Record ("Final EA/DR"). Plaintiff alleges that Defendants violated the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA") and other administrative authorities. Plaintiff's appeal is before the Court pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. For the reasons described below, the Court affirms the challenged agency actions.

## I. <u>BACKGROUND</u>

In 1990, FWS determined that the Dudley Bluffs Bladderpod (*Lesquerella congesta*) and the Dudley Bluffs Twinpod (*Physaria obcordata*) are threatened species of wild mustard plants ("the threatened plants") found only in the Piceance Basin in western Colorado. *See* 55 Fed. Reg. 4152-7 (Feb. 6, 1990). As required by 16 U.S.C. § 1533, FWS listed the threatened plants in its Endangered and Threatened Wildlife and Plants; 5-Year Review of Listed Species, 56 Fed Reg. 56882-01 (Nov. 6, 1991). The threatened plants therefore received ESA protection. The ESA prohibits the commercial

---

[1] FWS issued a Memorandum but the parties use BiOp so the Court adopts their nomenclature.

trade, removal, or malicious damage or destruction of endangered and threatened plants located on federal land. 16 U.S.C. § 1538(a)(2).

In February 2012, CSU began coordinating with BLM regarding its then proposed research project. (BLM-000128-9.)[2] In June 2012, CSU applied to FWS for a recovery permit to collect and propagate seeds of the threatened plants with the eventual goal of establishing new populations of them in suitable habitats. (DOI-000202-323.) On July 26, 2012, FWS issued to CSU the Federal Fish and Wildlife Permit number TE76718A-0 (DOI-000724-730) for a restoration project[3] of the threatened plants. The permit authorized CSU to "remove and reduce to possession seed [of the threatened plants] on Federal lands" and subsequently to "propagate seeds and reintroduce plants" subject to conditions yet to be determined. (DOI-000725-7.) The permit required CSU to obtain permissions and coordination with BLM, the landowner, and with FWS prior to collection and reintroductions. (DOI-000725.)

BLM was deemed to propose the "agency action" since it would determine whether or not to allow CSU's research project. Therefore as required by section 7 of the ESA, 16 U.S.C. § 1536(a), BLM consulted with FWS to ensure that the research project would not be likely to jeopardize the threatened plants or their habitat. In response thereto, on October 4, 2012, FWS issued its BiOp. (CSU-000484-5.)[4] In its BiOp, FWS noted the terms of the proposed research project. The relevant ones herein include: (1) that "[t]he purpose of the proposed research project is to explore possible

---

[2] The BLM citations are to the administrative record from the Department of Interior.
[3] The project is referred to interchangeably as a "research" and "restoration" project.
[4] The CSU citations are included within the administrative record from the Bureau of Land Management.

approaches for establishing new populations of [the threatened plants] in suitable habitats of the Piceance Basin in Northwestern Colorado in order to increase the plants' overall abundance in the region"; (2) that, "[p]rior to establishing new populations, CSU will consult with the BLM and [FWS] for approval of specific locations"; and (3) that "[t]he study areas will be located across all known element occurrences (EO) for [the threatened plants] in order to find plots far enough from current populations to avoid negatively influencing genetic flow." *Id.* FWS then concluded that "this research will be largely beneficial for both the bladderpod and the twinpod and the action therefor[e] may affect but is not likely to adversely affect bladderpod and twinpod." *Id.* at 485.

BLM may determine the environmental impact of a proposed agency action through an environmental assessment when the action would not significantly affect the environment, as the FWS had concluded in its BiOp. 43 C.F.R. 4501.4(b). It thereby determines if an environmental impact statement ("EIS") is required, and if not, it instead issues a "finding of no impact statement" ("FONSI"). 43 C.F.R. 4501.4(c) and (e).

Thus BLM proceeded with its environmental assessment ("EA"). On March 12, 2013, it posted a notice in the NEPA register to announce a March 20, 2013 meeting of stakeholders, those affected by the research project, to discuss the project. (BLM-0001321.) Plaintiff hosted this meeting at its regularly scheduled Rio Blanco County task force meeting. At the meeting, the BLM's Western Regional Field Office ("WRFO") proposed a collaborative effort among BLM, Rio Blanco County, FWS and industry to create a Conservation Plan to promote recovery of the threatened plants while accommodating resource extraction. (BLM-001497-8.) On July 18, 2013, the WRFO

notified the stakeholders, including Plaintiff, by letter (BLM-000075-86) that a Draft Environmental Assessment ("Draft EA") would be released on July 23, 2013, and that the stakeholders would have a 15 day period within which to provide comment on it.

On July 23, 2013, the WRFO issued the Draft EA and a draft FONSI. (BLM-001248-80; 0001278-80.) The Draft EA titled the project "Threatened plant species reseeding research" and described its intent and its parameters. Some of these included (1) that the project is "an attempt to expand current occupied habitat of two federally threatened plant species..." (BLM-001248); (2) that "[t]he ultimate goal of this project is to increase the likelihood that these species may be delisted" (BLM-001248); (3) that the determination to be made by BLM was "whether or not to allow the proposed threatened plant species reseeding research to proceed in the Piceance Basin, and if so, under what terms and conditions" (BLM-001249); (4) that "[t]he purpose of the proposed research project is to explore possible approaches for establishing new populations of these species in suitable areas in order to increase their overall abundance in the region" (BLM-001249-50); (5) that "[a]ll sites will be considered research populations and both the seeds and transplants will be protected under the [ESA] as threatened species" (BLM-001250); (6) "[i]f research populations are viable beyond 10 years they will be considered fully established and will not be treated differently than any other natural population" (BLM-001250); and (7) that "[t]here will be six, 5- x -5 meter study areas for each species to equal a total of 300 square meters utilized in the research project for the 12 separate study areas" (BLM-001251.) The Draft EA also included maps identifying the precise locations of the proposed research

plots and described the areas that could be impacted by the ESA protection accorded to the plots.  (BLM-001272-76, 001258-9, 001266.)

On August 7, 2103, Plaintiff submitted its written comments on the Draft EA.  At its September 11, 2013, Rio Blanco County task force meeting, Plaintiff hosted WRFO and CSU to discuss the research project and Plaintiff's comments on the Draft EA. (BLM-001282.)  On September 23, 2013, BLM approved the Final EA/DR, BLM Colorado State Director affirmed the approval, and BLM issued its EA/DR (BLM-001281-1319, 001241-4), and FONSI.  (BLM-001245-47.)  BLM's Final EA/DR largely preserved the procedure proposed in the Draft EA.

On October 23, 2013, Plaintiff filed an administrative appeal of BLM's Final EA/DR with IBLA and also petitioned IBLA to stay the BLM action.  On August 21, 2014, IBLA issued its Order affirming BLM's Final EA/DR and denied the petition for stay.[5] (BLM-001621-35.)  The Order constitutes the IBLA final agency action. *See* 43 C.F.R. § 4.403(a).

## II.  STANDARD OF REVIEW

This court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 704.

The APA instructs that the Court shall set aside a federal agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A) & (D). "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' [the court] must ensure that the agency 'decision was based on a consideration of the

---

[5] IBLA lacks jurisdiction over the issue of FWS's designation of the proposed plant population as "research" versus "experimental" and did not address it.

6

relevant factors' and examine whether there has been a clear error of judgment.''

*Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir. 1997).  The scope of

review is narrow and a court is not to substitute its judgment for that of the agency.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29,

43 (1983).  Agency decisions should be set aside "only for substantial procedural or

substantive reasons…not simply because the court is unhappy with the result reached."

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983).

Normally, the court may find a decision arbitrary and capricious if:

> the agency had relied on factors which Congress had not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency,
> or is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc., Id.*

Review of an agency's decision is usually deferential.  *See Citizens' Comm. to

Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1021 (10th Cir. 2002).  The

deference given ''is especially strong where the challenged decisions involve technical

or scientific matters within the agency's area of expertise.''  *Utah Envtl. Cong. v.

Bosworth,* 443 F.3d 732, 739 (10th Cir. 2006).  If the agency's exercise of discretion is

truly informed, then the court must defer to it.  *Utah Shared Access All. v. U.S. Forest

Serv.,* 288 F.3d 1205, 1213 (10th Cir.2002).  However, if the record shows that the

agency prejudged the issues, then deference to the agency's decision is diminished.

*See Davis v. Mineta,* 302 F.3d 1104, 1112 (10th Cir. 2002).

# III. ANALYSIS

## A. Standing

Plaintiff has standing to appeal the various agency actions pursuant to 5 U.S.C. § 704, on an organizational basis on behalf of its members. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). (Trade association has standing when it alleges that its members will suffer immediate or threatened injury from the challenged action so long as each member is not an indispensable party.)

Defendants challenge Plaintiff's standing to assert NEPA claims against Defendants, arguing that its claims do not fall within the environmental zone of interests protected by NEPA. The record shows otherwise. As described in this Order, Defendants considered Plaintiff to be a stakeholder that was entitled to participate in the environmental analysis due to the potential impact of the research project. Defendants thus invited comments from Plaintiff as part of their NEPA analysis and then relied on its participation to prove their NEPA compliance to IBLA. The Court concludes therefrom that Plaintiff has standing to assert its NEPA claims.

The Court addresses the appellate issues raised by the entities that submitted Amicus Briefs within its analysis below but not separately. The Court is mindful that these entities are unable to raise new issues on appeal. *Moffat Tunnel Imp. Dist. V. Denver S.L.Ry.Co.*, 45 F.2d 715, 722 (10th Cir. 1930).

## B. Endangered Species Act

The ESA provides the means to conserve endangered and threatened species. 16 U.S.C. § 1531(b). A "threatened species" is one that "is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).  Federal agencies are to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of [endangered or threatened species.]"  16 U.S.C. § 1536(a)(1).  The ESA authorizes the Secretary to trap and transplant endangered and threatened species, if necessary, to bolster the species such that the ESA protections become unnecessary.  *See* 16 U.S.C. §§ 1532(3) (defining "conservation"), 1536(a)(1).  Incidental taking permits, also known as Section 10 permits, are required when non-Federal activities will result in the incidental taking of listed species.  16 U.S.C. § 1539(a)(1).

## C. Availability of Section 10(a) to FWS

Plaintiff claims that FWS/BLM's various decisions are *ultra vires*, arbitrary, and capricious, and hence they should be reversed.  Specifically, Plaintiff claims that FWS erred in issuing its July 26, 2012 permit to CSU and its BiOp under 16 U.S.C. § 1539(a) ("Section 10(a)") instead of under 16 U.S.C. § 1539(j)(2) ("Section 10(j)").  Plaintiff argues that either the permit or the BiOp constitutes the FWS final agency action, while Defendants argue that the permit is the final agency action.  The Court finds that FWS's permit, not the BiOp, constitutes the FWS final action.  5 U.S.C. § 551(13), *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). (Includes "permit ... or other form of permission" in its definition of final agency action.)  Regardless, this designation of the final agency action does not change the analysis in this Order.

Plaintiff asserts that FWS violated the ESA by failing to implement the procedure specified in Section 10(j), as it applies to "experimental" plant populations. It alleges

that the "research population" of plants that FWS authorized to be introduced through the July 26, 2012 permit is in fact an "experimental population."  Plaintiff argues that compliance by FWS with Section 10(j) was mandatory and that FWS eliminated the substantive and procedural protections that Section 10(j) affords to the stakeholders by authorizing the research project pursuant to Section 10(a).

Defendants respond that FWS may issue permits for populations of threatened plants outside of the current range of the species pursuant to Section 10(a) as well as Section 10(j).  Defendants quote Section 10(a) at 16 U.S.C. § 1539(a):

> (1) The Secretary may permit, under such terms and conditions as he shall prescribe—(A) any act otherwise prohibited by section 1538 of this title for scientific purposes or to enhance the propagation or survival of the affected species, including but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j);

In addition, Defendants rely on 50 C.F.R. § 17.72, which authorizes the FWS to grant exemptions from the ESA prohibitions when the action is for "scientific purposes, the enhancement of the propagation or survival of threatened species … or other activities consistent with the purposes and policy of the [ESA.]"

Defendants also argue that, while Section 10(j) authorizes the release of experimental plant populations for conservation purposes, it merely supplements the existing authority of FWS under Section 10(a) to reintroduce endangered species into their historic ranges, including outside their current range.  The parties rely on different parts of the congressional record to support their positions.

Plaintiff replies that Section 10(j) overrules Section 10(a) based on the general principle of statutory construction that a particular section trumps a general one.

However, Plaintiff's construction does not appear to be the Tenth Circuit's interpretation of the statute.  In *Farm Bureau Federation v. Babbitt*, 199 F.3d 1224, 1231-32 (10th Cir. 2000), the Tenth Circuit found that Section 10(j) was an addition to the statute, not a replacement of Section 10(a):

> Congress added section 10(j) to the Endangered Species Act in 1982 to address the Fish and Wildlife Service's and other affected agencies' frustration over political opposition to reintroduction efforts perceived to conflict with human activity. Although the Secretary already had authority to conserve a species by introducing it in areas outside its current range, Congress hoped the provisions of section 10(j) would mitigate industry's fears experimental populations would halt development projects, and, with the clarification of the legal responsibilities incumbent with the experimental populations, actually encourage private parties to host such populations on their lands. H.R.Rep. No. 97–567, at 8 (1982)…

The Tenth Circuit therein also confirmed that, even prior to the enactment of Section 10(j), the Secretary had been authorized to introduce a species outside of its current range.  The Tenth Circuit concluded that Section 10(a) authorized FWS to introduce a threatened plant population outside of its current range without designating it as experimental.

Plaintiff next argues that FWS can introduce an experimental population outside of its current range pursuant to Section 10(j), only if it determines *by regulation* as specified by 16 U.S.C. § 1539(j)(2)(B) (emphasis added), that the experimental population is essential to the conservation of the species.  16 U.S.C. § 1539(j)(1) defines an experimental population as one which is "wholly separate geographically from the nonexperimental populations of the same species."  Plaintiff claims that, because the geographic location of the research population herein is separate from the existing plant population, it must be "experimental," as defined by Section 10(j).

Defendants respond that the term "experimental population," as defined by Section 10(j) and 50 C.F.R § 17.80(a), applies only when said population is "wholly separate geographically from the nonexperimental populations of the same species." Defendants argue that the locations of the research populations herein are actually within the current range of the existing populations and therefore the research populations do not qualify as Section 10(j) "experimental populations." Defendants note that the 1993 Draft Recovery Plan for the threatened plants (DOI-000925-1058) mapped their existence (DOI-000936) within a rectangular range of 27 miles from east to west and 19 miles from north to south. (DOI-000939.)

Plaintiff replies that, because BiOp intended the plant introductions to be "far enough from current populations to avoid negatively influencing genetic flow," they must be separate, and thus experimental.

"Congress purposely designed section 10(j) to provide the Secretary flexibility and discretion in managing the reintroduction of endangered species" under the ESA. *Farm Bureau Federation*, 199 F.3d at 1233. Thus, FWS has flexibility in interpreting "current range" and "wholly separate geographically" to address the context of the particular species. This Court is to defer to FWS's interpretation if it does not conflict with the plain language of the ESA. *Forest Guardians v. United States Fish and Wildlife Service*, 611 F.3d 692, 706 (10th Cir. 2010).

Plaintiff admits that additional intensive surveying would be required to ensure that the proposed populations would be separate from the current population. (DOI–000793) Yet Plaintiff did not actually contrast the EA's maps of the proposed plots with

the maps in Draft Recovery Plan to support its claims to the IBLA.  Plaintiff has failed to meet its burden of proving that the research population herein would be "wholly separate geographically" from the current range of the threatened plants.

The Court concludes that FWS's issuance of the July 26, 2012 permit to CSU was appropriate and not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**D.**     **ALLEGED NEPA VIOLATIONS**

    1.     The Scoping Process

Plaintiff claims that several of BLM's actions leading up to its authorization of the research project on federal lands are also improper and should be reversed.  Plaintiff claims that BLM violated the NEPA and the FLPMA, the latter through violations of the White River Resource Management Plan ("RMP"), the BLM Manual 6840 ("Manual") and the valid, existing rights that Plaintiff's members own through their leaseholds and federal rights-of-way.

Plaintiff claims that BLM violated the NEPA by disregarding the scoping procedure mandated by 40 C.F.R. § 1501.7, in that BLM failed both to adequately announce public meetings and to document the comments made and the alternatives proposed at such meetings. Plaintiff also asserts that BLM mischaracterized its procedure as scoping because BLM failed both to involve the public and to consider the proposed alternatives.

Plaintiff argued to IBLA (BLM-001479) and reiterates here that BLM did not identify the meeting of March 20, 2013, as a scoping meeting in its posting in the

Register.  Plaintiff also argues that BLM did not address the issues that Plaintiff raised, the identification of the meeting and its proposed use of an MOU, at the March 20, 2013 meeting in its Final EA/DR, as required by the NEPA Handbook Sections 6.3.2 at pg. 39 and 8.3.3 at pg. 78.  (BLM-000888, 000927.)  Citing to 40 C.F.R. §1503.4, Plaintiff also argues that BLM's failure to address contemporaneously the issues that Plaintiff raised at the September 11, 2013 meeting, as described in the NEPA Handbook (BLM-000914), rather than in its Final EA/DR violated NEPA.

Defendants respond that the procedure regarding scoping is inapplicable herein.

The Court agrees in part with Defendants.  40 C.F.R. § 1501.7 dictates the scoping procedure for an **EIS**, whereas BLM produced an **EA** herein.  However, NEPA places an obligation on BLM "to consider every significant aspect of the environmental impact of a proposed action."  *Forest Guardians*, 611 F.3d at 711.  Because BLM addressed this obligation through an EA and concluded that an EIS was unnecessary, the process set forth in 40 C.F.R. § 1501.7 is inapplicable.  Nonetheless, 43 C.F.R. § 46.305(a) requires BLM to "provide for public notification and public involvement" in the preparation of the EA, although it also vests BLM with discretion to determine the methodology therefor.

BLM described its external scoping process in its Final EA/DR.  (BLM-001282.) It identified the March 12, 2013 posting in the NEPA register, the attendance by BLM at the meetings of March 20 and of September 11, 2013 - which Plaintiff attended, and the 15 day public comment period that began on July 23, 2013, when BLM issued its draft EA and which it announced by letters dated July 18, 2013 to the stakeholders.

The record shows that BLM, in accordance with 43 C.F.R. § 46.305(a), clearly informed the stakeholders about the research project through its communications and its detailed Draft EA and that it received public comments on the project. BLM's process, regardless of whether or not it improperly named the meeting, constituted adequate public notification which, in fact, resulted in public involvement, including that of Plaintiff. *See Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004). ("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS.")

A second general aim of NEPA is to ensure that an agency will inform the public that it has considered environmental concerns in its decision making process. *See Forest Guardians,* 611 F.3d at 711. As identified in its Order, IBLA identified various instances of BLM's consideration of environmental concerns in the Final EA. (BLM-001625-6.) For example, the EA identified that three wells existed within one-half mile of three research population plots. The EA stated that pre-existing wells, facilities, and rights-of–way would continue, provided they "would not preclude the survival or recovery of the species." The EA noted that, while 11 of 12 of the research plots are on leaseholds, the additional effects on lease activities could involve only three sites: those which were not currently subject to "no surface occupancy stipulations" ("NSO"), "controlled surface use," or detrimental slopes that are undesirable for development. The EA stated that recovery of resources could still occur with directional drilling. The EA also stated that maintenance and construction of existing rights-of-way would continue provided they do not preclude the survival or recovery of the species. It noted

that none of the existing or proposed rights-of-way were located within 50 meters of a

plot.  The EA quantified that the research project would add 15 acres of land restrictions

for mineral development during the initial ten years, which could thereafter increase to

450 acres, constituting an increase of land encumbered by restrictions of only

approximately 0.5 percent.

Consistent with NEPA, BLM considered both the impact of the action proposed in

the Draft EA and as well as the impact of taking no action.  *Utah Envtl. Cong. v.*

*Bosworth,* 439 F.3d 1184, 1195 (10th Cir. 2006).  In its Order, IBLA noted that BLM

effectively had no other suitable alternatives to the locations that it identified for the

research population plots.  (BLM-001631.)  The IBLA Order documents that BLM

strategically located the plots so as to minimize their impact on the leaseholders, and no

stakeholder suggested any alternative locations for the proposed plots.  Hence, the

Court concludes that BLM adequately informed the public of its consideration of the

environmental concerns of the research project, consistent with *Forest Guardians,*

*supra*.

2.     The Irretrievable Commitment of Resources

Plaintiff argues that BLM impermissibly committed predetermination, an

irreversible and irretrievable commitment of resources, before undertaking the EA

analysis.  Plaintiff alleges that documents undisclosed at the IBLA level reveal that BLM

made its commitment of resources by letter dated May 21, 2012. [6]  (BLM-001024.)  BLM

had thereby declared its support of CSU's request for a Section 10 permit for its

---

[6] The Court notes that this letter is included in the record twice at BLM-001024 and 001048.

proposed research project.  BLM also stated therein that it had given permission to CSU to conduct the research on lands that it administered, and that it would help identify suitable research plots.  *Id.*

Plaintiff argues that early actions taken by BLM, FWS, and CSU prior to BLM's notice about the March 12, 2013 public meeting, forced BLM to approve the research project in its Final EA/DR to avoid losing the seeds that CSU had already collected.[7] These early actions include: a) BLM's issuance of the July 26, 2012 permit to CSU;[8]  b) a September 22, 2012 Assistance Agreement between FWS and CSU whereby FWS partially funded the project in the amount of $6,000 (BLM-001742-56.); c) CSU began growing seeds in its green house, with FWS/BLM knowledge, in January 2013 (BLM-000557.); and d) FWS's amendment to its Assistance Agreement with CSU to increase the partial funding by $54,000 on February 14, 2013 (BLM-001760-2.).

Defendants respond that none of the activities described by Plaintiff constitute an irreversible and irretrievable commitment of resources.  Defendants argue that Plaintiff would need to show that the July 26, 2012 permit for seed collection predetermined the decision of when and where to plant the seeds.  Defendants argue that the permit neither authorized the planting of the threatened plants on federal lands nor identified the location of any proposed research plots on them.

Defendants next note that the purpose of the Assistance Agreements was to explore the possible establishment of new populations of the threatened plants in

---

[7] Plaintiff claims that CSU had gathered seeds in June 2012 pursuant to a BLM permit (BLM-000177), but the record is inconclusive on this allegation and said "permit" is not appealed.
[8] The Court notes that Plaintiff misinterprets the record in part.  FWS granted to CSU the July 26, 2012 permit to collect seeds, not BLM as Plaintiff alleges.

suitable areas.  (BLM-001745.)  CSU's proposed activities, as accepted through the

initial Agreement, included a "mixture of laboratory, greenhouse and field studies" (BLM-

001726) in addition to the reintroduction of the threatened plants in yet to be determined

locations.  (BLM-001727.)  The Agreement required CSU to consult BLM regarding

progress and upcoming plans.  (BLM-001727.)  The Agreement incorporated by

reference the assurances from CSU's Application that the project would comply with all

relevant environmental standards, laws and policies.  (BLM-001735, 1746.)  The

amended Agreement did not relax these assurances of compliance.  (BLM-001760.)

Defendants thus conclude that the Agreements neither authorized the planting of plants

on federal lands nor identified the location of any proposed research plots on them.

Although it was FWS, not BLM, that granted to CSU the July 26, 2012 permit to

collect seeds, the Court notes that BLM did support CSU's efforts to obtain approval of

the research project, as evidenced by its letter of May 21, 2012, and its participation

within the Agreements.  Notably, BLM explained in the Final EA that it worked with FWS

to expedite the planning process to accommodate the project staff.  FWS implemented

the term "research population" (BLM-001311) and thus avoided the more extensive

procedure required for an experimental population.  BLM also finalized the EA by the

end of September 2013, for its approval by its Colorado State Director, before she

retired.  (BLM-00045.)

"A petitioner must meet a high standard to prove predetermination. …

[P]redetermination occurs only when an agency *irreversibly and irretrievably* commits

itself to a plan of action that is dependent upon the NEPA environmental analysis

producing a certain outcome, *before* the agency has completed that environmental analysis-which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action." *Forest Guardians,* 611 F.3d at 714.

In the instant case, the record as described above does not meet the high standard necessary to prove predetermination. Neither the actions of BLM nor the actions of FWS committed BLM to the planting of seeds or transplants on federal lands. Although BLM and FWS were supportive of the eventual planting of research populations on federal lands, this receptiveness did not constitute predetermination. The permit and Agreements did not authorize CSU to unilaterally plant the research plots; rather, CSU needed consent from both FWS and BLM to plant them. Presumably FWS and BLM would withhold their consent if the Final EA/DR determined that such action was inappropriate. Predetermination is not present "simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the *possibility* that a particular environmental outcome would be the result of its NEPA review of environmental effects." *Id.* at 715. BLM took the necessary actions to facilitate what became the ultimate decision of the Final EA/DR, but these actions did not individually or collectively commit it to implementing that ultimate decision. *See* 40 C.F.R. § 1506.1(d)*; Los Alamos Study Grp. v. U.S. Dept. of Energy*, 692 F.3d 1057, 1066-68 (10th Cir. 2012) (The approval of ancillary, interlocutory actions is not predetermination.) Hence, the Court concludes that BLM did not violate NEPA by committing any impermissible predetermination.

### E. Federal Land Policy and Management Act

#### 1. Resource Management Plan

The FLPMA mandates the development of the RMP to guide BLM's management of public lands. 43 U.S.C. § 1712, 43 C.F.R. 1601.1. Pursuant to 43 C.F.R. § 1601.0-2, BLM approved its RMP (BLM-00606-836) in 1997 to provide this guidance. (BLM-000604.) Plaintiff argues that the RMP limits the mechanisms for implementing the recovery of the threatened plants to surface use restrictions or to acquisition of private lands with suitable habitat. (BLM 000635-6.) Plaintiff notes that the RMP does not specifically authorize the creation of "research populations" or re-seeding or transplanting the plants for their recovery. (BLM-000635-6.) Plaintiff argues that BLM could have included the option to create new habitat through the use of research populations in the RMP had it so intended. Therefore, Plaintiff argues that BLM's use of the research populations violated the RMP.

Defendants respond that the use of the research population is consistent with the RMP's Objective regarding Threatened and Endangered Plant Species, to "Promote the recovery of Federally listed and proposed threatened or endangered plant species." (BLM-000635.) Relying on 43 C.F.R. § 1601.0-5(b),[9] Defendants note that IBLA stated that conformance with a land use plan is achieved when an action is "specifically provided for in the plan, or if not specifically mentioned, [is] … clearly consistent with the terms, conditions, and decisions of the approved plan." (BLM-0001631.) In addition,

---

[9] 43 C.F.R § 1601.0-5 now defines Conformance to mean "that a resource management action shall be clearly consistent with the plan components of the approved [RMP]..." *See* 81 FR 89661, effective January 11, 2017. This revised definition is substantively similar to the former § 1601.0-5(b). 43 C.F.R. § 1601.9(c)(1) mandates that the actions that an agency takes before it adopts a new RMP after January 11, 2017 must also be "clearly consistent with the terms, conditions, and decisions of the approved plan."

Defendants note that IBLA specifically found that the research project "clearly implements and conforms to the goals" of the RMP.  (BLM-001632.)

Again, the Court notes that IBLA's construction of the regulation is entitled to "substantial deference."  *Utah Envtl. Cong. V. Troyer*, 479 F.3d 1269, 1281 (10th Cir. 2007).  The Court concurs that BLM's use of a research population is consistent with the RMP's Objective to promote the recovery of threatened species.  Hence, the Court concludes that BLM did not violate its RMP.

2.      BLM Manual 6840

Plaintiff argues that BLM violated its Manual because, although the Manual authorizes the use of experimental populations in its Sect. H.2.b and c, it does not authorize the use of research populations.  Plaintiff argues that BLM violated the Manual through its complicity with FWS in order to avoid what should have been the mandatory designation of the research populations as experimental.

Defendants respond that BLM is not legally bound to implement the Manual as it was not promulgated in accordance with APA procedures.  They also argue that the Manual does not impose a duty on BLM to establish an experimental population of the threatened plants.

Defendants are correct that the Manual does not require BLM to establish an experimental population of the threatened plants.  The Manual states at H.2.b. "The BLM shall cooperate and assist in establishing experimental populations of listed species on BLM-managed lands when such establishment is consistent with BLM land use plans and policy…"  (BLM-001077.)  As discussed above, FWS, not BLM, has the

statutory authority to designate a population of a species as experimental. Had FWS designated an experimental population, BLM would have been required to "cooperate and assist" in its establishment. However, because FWS did not so designate the population, BLM's duty under this provision never materialized. The Court concludes that BLM did not violate its Manual.

### 3. Valid Existing Rights

Plaintiff argues that BLM violated the valid existing rights of its members by locating the plots of the research populations of the threatened plants on their federal oil and gas leaseholds and near their federal rights-of-way. Plaintiff cites caselaw that has recognized valid existing rights, the Manual's requirement that the BLM honor valid existing rights, and the RMP's stated goal of honoring valid existing rights. Plaintiff notes that existing NSOs and COAs on some leaseholds restrict activity on mapped populations of the plants, but not on the entire surface of the leased lands. Plaintiff also argues that BLM is eroding the rights of its members through the location of the threatened plants as its members will be subject to the statutory protections accorded to the threatened plants.

Defendants respond that Plaintiff merely alleges the possibility of injury to the rights of its members but cites no actual or imminent injury. Defendants also argue that the members of Plaintiff did not receive unfettered rights through their leaseholds. Defendants note that IBLA found that all the "leases are subject to Section 6 of the standard lease terms" which requires that lessees terminate operations that would destroy threatened or endangered species (BLM-001633), and that BLM may require

"reasonable measures" of its lessees to "minimize adverse impacts...not addressed in the lease stipulations at the time operations are proposed." 43 C.F.R. § 3101.1-2.

The Court concludes that, although the research plots will affect the land under lease to Plaintiff's members and their rights-of-way, given the parameters of said rights, Plaintiff has shown no injury to those rights. Thus, no relief is available to them.

## IV. **CONCLUSION**

For these reasons, the Court concludes that the FWS and BLM agency actions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that neither FWS nor BLM violated the ESA, the NEPA, or the FLPMA. Accordingly, the Court affirms the FWS and BLM agency actions.

DATED: August 16, 2017

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge